IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| **NORMAL ALLEN,** | ) |
| **Plaintiff,** | ) ) ) |
| vs. | ) Civil No.  13-cv-246-CJP[1] ) |
| **CAROLYN W. COLVIN,** **Acting Commissioner of Social Security,** | ) ) ) ) |
| **Defendant.** | ) |

## MEMORANDUM and ORDER

**PROUD, Magistrate Judge:**

In accordance with 42 U.S.C. § 405(g), plaintiff Norman Allen, through counsel, seeks review of the final decision of the Commissioner of Social Security denying him Disability Insurance Benefits (DIB).

## Procedural History

Mr. Allen applied for benefits in March, 2010, alleging disability beginning on October 31, 2007.  (Tr. 12).  After holding an evidentiary hearing, ALJ Rebecca LaRiccia denied the application for benefits in a decision dated August 31, 2011.  (Tr. 12-19).  The Appeals Council denied review, and the decision of the ALJ became the final agency decision.  (Tr. 1).  Administrative remedies have been exhausted and a timely complaint was filed in this Court.

---

[1] This matter was referred to the undersigned for final disposition upon consent of the parties, pursuant to 28 U.S.C. §636(c).   See, Doc. 13.

1

### Issues Raised by Plaintiff

Plaintiff raises the following points:

1. The ALJ erred in weighing the medical opinions.

2. The ALJ's findings were not supported by the vocational expert's testimony.

### Applicable Legal Standards

To qualify for DIB, a claimant must be disabled within the meaning of the applicable statutes. For these purposes, "disabled" means the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." **42 U.S.C. §423(d)(1)(A).**

A "physical or mental impairment" is an impairment resulting from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques. **42 U.S.C. §423(d)(3).** "Substantial gainful activity" is work activity that involves doing significant physical or mental activities, and that is done for pay or profit. **20 C.F.R. §§ 404.1572.**

Social Security regulations set forth a sequential five-step inquiry to determine whether a claimant is disabled. The Seventh Circuit Court of Appeals has explained this process as follows:

> The first step considers whether the applicant is engaging in

substantial gainful activity. The second step evaluates whether an alleged physical or mental impairment is severe, medically determinable, and meets a durational requirement. The third step compares the impairment to a list of impairments that are considered conclusively disabling. If the impairment meets or equals one of the listed impairments, then the applicant is considered disabled; if the impairment does not meet or equal a listed impairment, then the evaluation continues. The fourth step assesses an applicant's residual functional capacity (RFC) and ability to engage in past relevant work. If an applicant can engage in past relevant work, he is not disabled. The fifth step assesses the applicant's RFC, as well as his age, education, and work experience to determine whether the applicant can engage in other work. If the applicant can engage in other work, he is not disabled.

**Weatherbee v. Astrue, 649 F.3d 565, 568-569 (7th Cir. 2011).**

Stated another way, it must be determined: (1) whether the claimant is presently unemployed; (2) whether the claimant has an impairment or combination of impairments that is serious; (3) whether the impairments meet or equal one of the listed impairments acknowledged to be conclusively disabling; (4) whether the claimant can perform past relevant work; and (5) whether the claimant is capable of performing any work within the economy, given his or her age, education and work experience. **20 C.F.R. §§ 404.1520; Simila v. Astrue, 573 F.3d 503, 512-513 (7th Cir. 2009); Schroeter v. Sullivan, 977 F.2d 391, 393 (7th Cir. 1992).**

If the answer at steps one and two is "yes," the claimant will automatically be found disabled if he or she suffers from a listed impairment, determined at step three. If the claimant does not have a listed impairment at step three, and cannot perform his or her past work (step four), the burden shifts to the Commissioner at step five to show that the claimant can perform some other job. **Rhoderick v.**

3

*Heckler*, **737 F.2d 714, 715 (7th Cir. 1984).** *See also Zurawski v. Halter*, **245 F.3d 881, 886 (7th Cir. 2001**)(Under the five-step evaluation, an "affirmative answer leads either to the next step, or, on Steps 3 and 5, to a finding that the claimant is disabled…. If a claimant reaches step 5, the burden shifts to the ALJ to establish that the claimant is capable of performing work in the national economy.").

This Court reviews the Commissioner's decision to ensure that the decision is supported by substantial evidence and that no mistakes of law were made.  It is important to recognize that the scope of review is limited.  "The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive. . . ." **42 U.S.C. § 405(g)**.  Thus, this Court must determine not whether Mr. Allen was, in fact, disabled at the relevant time, but whether the ALJ's findings were supported by substantial evidence and whether any errors of law were made.  **See,** *Books v. Chater*, **91 F.3d 972, 977-78 (7th Cir. 1996)** (citing *Diaz v. Chater*, **55 F.3d 300, 306 (7th Cir. 1995)**).  This Court uses the Supreme Court's definition of substantial evidence, i.e., "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, **402 U.S. 389, 401 (1971).**

In reviewing for "substantial evidence," the entire administrative record is taken into consideration, but this Court does <u>not</u> reweigh evidence, resolve conflicts, decide questions of credibility, or substitute its own judgment for that of

4

the ALJ.  **Brewer v. Chater, 103 F.3d 1384, 1390 (7th Cir. 1997)**.  However, while judicial review is deferential, it is not abject; this Court does not act as a rubber stamp for the Commissioner.   See, **Parker v. Astrue, 597 F.3d 920, 921 (7th Cir. 2010), and cases cited therein.**

### The Decision of the ALJ

ALJ LaRiccia followed the five-step analytical framework described above. She determined that Mr. Allen had not been engaged in substantial gainful activity since the date of his application.  She found that plaintiff had severe impairments of obesity, herniated disc and seizure disorder, and that these impairments do not meet or equal a listed impairment.  The ALJ found that Mr. Allen had the residual functional capacity to perform work at the sedentary exertional level, with some limitations.  Based on the testimony of a vocational expert, the ALJ found that plaintiff was not able to do his past relevant work, but he was able to do other work that exists in significant numbers, such as assembler, sorter and visual inspector.

### The Evidentiary Record

The Court has reviewed and considered the entire evidentiary record in formulating this Memorandum and Order.  The following summary of the record is directed to the points raised by plaintiff.

1. **Agency Forms**

Plaintiff was born in 1971, and was almost 36 years old on the alleged onset date of October 31, 2007.  He was insured for DIB through December 31, 2012.

(Tr. 122). He completed the tenth grade in school and had been in special education classes. He completed a truck driving school program in 1997. (Tr. 140-141).

According to plaintiff, he had a number of health problems which made him unable to work, including a pinched nerve in his lower back, pain down his left leg due to nerve damage, weakness in his right leg, herniated disc at L4, arthritis in "disc area," short term memory loss, prior back and head injuries in 1995, and "unspecified tremors" in right arm and leg. (Tr. 139).

Mr. Allen had worked as a deliveryman, delivering food, soda and water. He had also delivered newspapers, and worked in a factory. (Tr. 142, 150).

In a Function Report submitted in October, 2010, Mr. Allen stated that he needed a cane to walk. He said that he had a burning feeling in his back when he walked and he had trouble bending over, squatting, lifting, standing, reaching, kneeling, walking, crawling and climbing stairs. (Tr. 169).

2.    **Evidentiary Hearing**

Mr. Allen was represented by an attorney at the evidentiary hearing on July 18, 2011. (Tr. 26).

Plaintiff testified that he was 39 years old, was 5'10" tall and weighed 280 pounds. (Tr. 28). He last worked in 2007 as truck driver and deliveryman for a beverage company. (Tr. 29-30). He was injured at work in October, 2007, when a 200 pound dock plate fell on him, injuring his back and leg. (Tr. 32). He settled a workers compensation claim for about $80,000.00 in 2009. (Tr. 33-34).

Mr. Allen testified that he could hardly walk without a cane, and could not pick up anything heavy.  He could not even pick up his grandchildren.  His wife had to help him take a bath.  (Tr. 31).  He had constant burning and sharp pain in his back, and constant shooting pain down his right leg.  (Tr. 33).  He had headaches all day long, which started a short time after the accident.  He also had seizures, usually once a day.  He was taking medication for headaches and seizures.  (Tr. 36-37).  He was taking Elavil to help him sleep and Cymbalta for depression.  (Tr. 38).

On a typical day, his wife helped him out of bed, and then she went to work. He spent the day lying down in the bedroom or sitting in a chair in the living room. He did no household chores, other than putting food in the microwave.  He needed help with bathing and dressing.  He no longer drove because of the seizures.  He last had a seizure about a week earlier.   (Tr. 39-40).

Dr. Taylor prescribed a cane.   If he walked without the cane, he stumbled a lot. (Tr. 34-35).  Using his cane, he could walk 15 feet or so.  Standing for 5 minutes caused him back pain.  He had to stand up after sitting for 10 minutes. He could not lift even a gallon of milk.   (Tr. 41-42).

His doctor would not consider surgery until he lost weight.   Dr. Taylor told him he would not be candidate for surgery.   He took medication.   Physical therapy had made him worse.   (Tr. 34).

Plaintiff's wife testified that, in the last month, he had maybe four large seizures.   He had small seizures, "like tremors," 4 or 5 times a week. He was taking

7

Gabapentin to control his seizures. (Tr. 47-48).

A vocational expert (VE) also testified. The ALJ asked the VE to assume a person who was able to do work at the sedentary level, and able to stand for 2 hours a day and sit for 6 hours day. He needed to be able to alternate between sitting and standing at will. He was limited to only occasional postural activities, e.g., stooping and kneeling, and could never climb ladders, ropes or scaffolds or work around dangerous machinery or at unprotected heights. (Tr. 48-49). The VE testified that this person could not perform any of plaintiff's past work. However, he would be able to do other work, such as assembler, sorter and visual inspector. (Tr. 50).

The VE confirmed that, if a person used a cane "for ambulation, " it would have no impact on ability to do those jobs. The ALJ then asked whether "if a person needed to use the cane for ambulation and also to support himself while standing, would that allow for those jobs?" The VE replied:

> Yes, well – let me – what I mean to say is it depends on how long the person has to be in the standing position. If it's anymore [sic] than about 10 percent of the (INAUDIBLE) time, then it would have a serious impact. So that would render the (INAUDIBLE), in other words when they're standing using the cane.

The ALJ then asked "So that would be – anything beyond a 10 percent time allowed for off task behavior would preclude all work, is that correct?" The VE replied, "Yes, Judge." (Tr. 50-51).

Plaintiff's counsel did not ask any follow-up questions about the effect of using a cane. (Tr. 51-52).

8

### 3. Medical Treatment

On October 31, 2007. plaintiff was seen in the emergency room for a right leg injury caused by a dock plate striking his leg.  He had abrasion and swelling in his right lower leg.  (Tr. 204).  An x-ray showed stabilization hardware and bone deformity consistent with an old injury, but no acute findings.  (Tr. 205).

Plaintiff returned to the emergency room on November 4, 2007, complaining of low back and right leg pain.  X-rays of the lumbar spine were normal.  A Doppler study of the right leg showed no evidence of deep vein thrombosis. He was prescribed pain medication and released.  (Tr. 363-375).

In March, 2008, nerve conduction studies of the right leg were normal.  (Tr. 219).  In April, 2008, MRI and CT scan of the lumbar spine showed diffuse disc herniation at the L4 transitional level.  (Tr. 213-214).

Mr. Allen first saw Dr. Brett Taylor, an orthopedic specialist, on April 30, 2008.  He had been referred by Dr. Varanasi.  He complained of back and leg pain.  On examination, he was 70 inches tall and weighed 280 pounds.  He had an antalgic gait.  He was able to take a few steps on heels and toes.  Straight leg raising was negative.  He had 4/5 motor strength limited due to pain.  Dr. Taylor noted that the CT showed evidence of disc herniation at L4-L5.  He also noted that plaintiff had come to him thinking the visit had been approved by the workers compensation carrier, but it had not been.  Dr. Taylor recommended further testing and referred him to another doctor ("Dr. Dave") for nerve root injections. (Tr. 248-249).  There is no indication that plaintiff underwent nerve root

9

injections.

On May 8, 2008, on Dr. Taylor's referral, Dr. Daniel Phillips examined plaintiff and performed nerve conduction studies in both legs. Dr. Phillips documented normal strength in both lower extremities. Straight leg raising was negative. EMG nerve conduction studies were normal. Dr. Phillips wrote that "the study is not impressive for active lumbar radiculopathy, lumbosacral plexopathy or peripheral neuropathy." He added that "Detailed EMG did not demonstrate evidence for L4 radiculopathy. Parenthetically, the distribution of his pain is not reminiscent of an L4 radiculopathy." (Tr. 460).

Dr. David Lange examined plaintiff on behalf of the workers compensation carrier in September, 2008. Dr. Lange concluded that Waddell testing was moderately positive.[2] As an example, he noted that Mr. Allen declined to attempt to walk on toes for no particular reason, described tenderness to "extremely light touch" on the left low back, exhibited "mild give way 'weakness' in essentially all motors in the lower extremities tested," and exhibited "peculiar" shaking of the right leg "in an intermittent fashion." He complained of decreased sensation in the right calf, but neurologic examination was objectively normal. Among the differential diagnoses, Dr. Lange noted "[s]ignificant signs of symptom magnification (see Waddell testing)." He also noted shallow contained disc

---

[2] "Waddell signs are manifestations of pain resulting from specific maneuvers that should not induce back pain, and are used to identify patients reacting to 'psychosocial' factors, such as economics or social issues, including pending litigation." *Hilmes v. Barnhart*, 118 Fed. Appx. 56, 58 (7th Cir. 2004). The presence of Waddell signs does not necessarily indicate malingering. *Ibid*, at 61.

10

herniation at L4-5 and probable chemical dependency. He opined that plaintiff could do work at the light-medium level, with occasional lifting of 30 pounds and only intermittent sitting, standing and walking. His driving time should be limited to 30 to 45 minutes at a time. (Tr. 228-233).

In December, 2008, Dr. Taylor wrote that Mr. Allen's physical exam was unchanged. Mr. Allen brought in a "note" from Dr. Lange which described a shallow herniated disc. Dr. Taylor noted that he was not the best candidate for surgery "with multiple positive Waddell's, a likely chemical dependency on a host of medications." Dr. Taylor suggested a number of treatment options such as physical therapy and nerve root injections. (Tr. 243-245). On April 28, 2009, Dr. Taylor again suggested additional work-up or physical therapy and nerve root injections. He would not be a candidate for surgery unless he weaned himself off narcotics and got his BMI below 38. Plaintiff was more interested in getting an assessment of his functional capacity. (Tr. 242).

In June, 2009, physical therapist Kimberly Going completed a functional capacity evaluation. She concluded that Mr. Allen could frequently sit and occasionally stand and walk. He could frequently climb stairs and was able to climb ladders. He could operate "light" arm and leg controls. He could do fine movements with both hands. She classified plaintiff as "cannot work," but stated in her comments that "Pt [patient] demonstrated ability to work below his prior activity level per pt's description of job duties." (Tr. 278-302).

On June 23, 2009, Dr. Taylor noted that the functional capacity exam

showed he was "not capable of working." His weight was up to 306 pounds. On exam, he had an antalgic gait and was using a cane. Mr. Allen was "adamant" that he did not want surgery. (Tr. 239).

Plaintiff's workers compensation claim was settled for $88,240.00 in December, 2009. (Tr. 211).

Plaintiff saw Dr. Varanasi from January, 2009, through November, 2009, and from May, 2010, through July, 2011. As plaintiff admits, his office notes are "largely illegible." Doc. 23, p. 7.

Dr. Varanasi completed a form report at the request of the agency on May 25, 2010. He indicated a diagnosis of "injury-lumbar radiculopathy" with numbness/loss of sensation in the left lower extremity. Under "physical findings," he indicated plaintiff had tenderness in the lumbosacral spine, paresthesia, and weakness and reflex changes in the right lower extremity. He said he found positive straight leg raising on the left in a supine position, but not in a sitting position. He said that plaintiff needed to use a cane and had "significant muscle weakness" in the right lower extremity. Dr. Varanasi opined that plaintiff could walk for less than 1 block and sit for only 15 minutes at a time. In answer to a question about treatment and medication, Dr. Varanasi indicated there were none. He also stated that plaintiff had a "poor/none" response to treatment. (Tr. 380-382)

Dr. Varanasi ordered lumbar x-rays in June, 2010, which showed only "mild arthritic changes" at L4-5 and L5-S1. (Tr. 452).

In July, 2010, Dr. Aziz Rahman examined plaintiff at the request of the agency. Mr. Allen complained of pain in his back radiating into his left leg and sometimes into his right leg also. He was using a cane to walk. He denied any headache, seizure activity or depression symptoms. On exam, he weighed 310 pounds. Range of motion of the lumbar spine was limited. Muscle tone and power in the upper and lower extremities was normal. Hand grip was normal and he was able to manipulate with the fingers of both hands. Deep tendon reflexes were symmetrical. His gait was somewhat unsteady. He was "limping mostly on the right side because of the pain in the right leg." (Tr. 386-390).

Dr. Varanasi ordered a CT scan of the head due to complaints of headache and seizures, which was done in September, 2010. It was negative. (Tr. 450). An EEG in September, 2010, was also normal. (Tr. 448-449).

An MRI of the lumbar spine in October, 2010, showed minimal disc bulge without herniation at L2-3, L3-4, and L5-S1. At L4-5, there was moderate posterior disc/osteophyte complex with mild to moderate impression on the thecal sac without distinct spinal stenosis and 50% bilateral neural foraminal narrowing due to degenerative changes "which may cause symptomatology with the bilateral L4 nerve roots." (Tr. 441-442).

Dr. Varanasi ordered an MRI of the brain, which was done in October, 2010. The clinical history note reads, "Headaches for one year. Decreased hearing I left ear. Seizures." The MRI showed no abnormalities. (Tr. 440).

A medical equipment supply company delivered a shower chair and grab

13

bars to plaintiff in March, 2011.  (Tr. 482).

In July, 2011, Dr. Varanasi prescribed a back brace for low back pain.  (Tr. 483).

### 4. RFC Assessment

Dr. Madala, a state agency consultant, assessed plaintiff's physical RFC in July, 2010.  He reviewed medical records, but did not examine plaintiff.  He opined that plaintiff was able to do work at the light exertional level, i.e., frequently lift 10 pounds and occasionally lift 20 pounds, limited to 2 hours of standing/walking per day and only occasional postural activities.  (Tr. 393-400).

## Analysis

### 1. Weighing of medical opinions

ALJ LaRiccia discussed the medical opinions at Tr. 17-18.  She gave little weight to Dr. Varanasi's report because she felt his opinions were inconsistent with the record as whole and with his own limited findings, and they relied on plaintiff's subjective complaints.  She gave "limited weight" to the report of the functional capacity exam by physical therapist Going because parts of it were inconsistent with the record.  She gave little weight to Dr. Taylor's opinion because his exam "was performed for worker's compensation insurance" and the worker's compensation system uses different standards for disability.  She gave "some weight" to Dr. Lange's report and to the opinions of the state agency reviewer.  She did not discuss the report of the consultative examiner, Dr. Rahman.

14

The version of 20 C.F.R. §404.1527(d)(2) in effect at the time of the ALJ's decision states:

> Generally, we give more weight to opinions from your treating sources, since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of your medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations. <u>If we find that a treating source's opinion on the issue(s) of the nature and severity of your impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in your case record, we will give it controlling weight.</u> [Emphasis added]

If the ALJ determines that a treating doctor's opinion is not entitled to controlling weight, he must apply the §404.1527(d) factors to determine what weight to give it.  **Campbell v. Astrue, 627 F.3d 299, 308 (7th Cir. 2010)**.

It must be noted that, "while the treating physician's opinion is important, it is not the final word on a claimant's disability." **Books v. Chater, 91 F.3d 972, 979 (7th Cir. 1996)(internal citation omitted).**  If is the function of the ALJ to weigh the medical evidence, applying the factors set forth in §404.1527. Supportability and consistency are two important factors to be considered in weighing medical opinions.  See, 20 C.F.R. §404.1527(d).[3]

There are two obvious problems with the ALJ's consideration of the medical opinions.  Dr. Taylor treated plaintiff, while Dr. Lange examined him one time at

---

[3] The Court cites to the version of 20 C.F.R. §§ 404.1527 that was in effect at the time of the ALJ's decision. The agency subsequently amended the regulation by removing paragraph (c) and redesignating paragraphs (d) through (f) as paragraphs (c) through (e). 77 Fed. Reg. at 10656–57 (2012).

15

the request of the worker's compensation carrier. The ALJ rejected Dr. Taylor's "work status report" because it was based on worker's compensation standards, but failed to apply that same logic to Dr. Lange's report. In addition, the ALJ failed to evaluate the opinion of Dr. Rahman, who performed the consultative examination.

An ALJ's decision must be supported by substantial evidence. While she is not required to discuss every piece of evidence in his decision, the discussion must be sufficient to "provide 'an accurate and logical bridge' between the evidence and [her] conclusions." **Roddy v. Astrue, 705 F.3d 631, 636 (7th Cir. 2013), internal citations omitted.**

The ALJ discounted the opinions of Dr. Varanasi and PT Going because they were not consistent with the record as a whole. However, she could not accurately make this determination without considering all of the medical evidence, including the report of the consultative examination.

The Commissioner argues that the ALJ was entitled to reject the functional capacity evaluation because it was conducted by a physical therapist (not an acceptable medical source), and it opined that plaintiff could not work, which is an opinion that is reserved to the Commissioner. See, Doc. 33, p. 14. These are not reasons that were relied upon by the ALJ. In advancing reasons not relied upon by the ALJ, the Commissioner violates the *Chenery* doctrine. See, **SEC v. Chenery Corporation, 318 U.S. 80 (1943).** "Under the *Chenery* doctrine, the

Commissioner's lawyers cannot defend the agency's decision on grounds that the agency itself did not embrace." **Kastner v. Astrue, 697 F.3d 642, 648 (7th Cir. 2012).**

The ALJ was certainly not required to give controlling weight to the opinion of Dr. Varanasi. A treating doctor's medical opinion is entitled to controlling weight only where it is supported by medical findings and is not inconsistent with other substantial evidence in the record. **Clifford v. Apfel, 227 F.3d 863 (7th Cir. 2000); Zurawski v. Halter, 245 F.3d 881 (7th Cir. 2001)**. Obviously, in determining whether medical opinions are inconsistent with other evidence in the record, the ALJ must fairly consider all of the medical evidence. An ALJ may not selectively consider medical reports or ignore medical evidence favorable to the claimant. **Myles v. Astrue, 582 F.3d 672, 678 (7th Cir. 2009).**

### 2. VE's testimony

As part of her RFC findings, the ALJ concluded that plaintiff could only occasionally balance, and "requires the use of a cane for ambulation." She also found that plaintiff needs a sit/stand option, but did not make a specific finding as to whether plaintiff requires a cane to support himself while standing.

In questioning the VE, the ALJ drew a distinction between needing a cane for ambulation and needing a cane for support while standing. The VE testified that needing a cane for ambulating would not interfere with his ability to do the jobs identified by the VE in response to the hypothetical question. He also testified that,

17

if the person needed to use a cane for support while standing, and he needed to stand more than 10% of the time, "it would have a serious impact" and "would preclude all work." (Tr. 50-51).

The ALJ did not acknowledge this crucial testimony in her decision, and did not make a specific finding as to whether plaintiff needed a cane for support while standing. There was evidence to support such a finding, in that Dr. Varanasi opined that plaintiff needed a cane for walking, standing and balancing, and he prescribed a shower chair. (Tr. 381, 482) This is not to suggest that the record compelled a finding that Mr. Allen requires a cane while standing. However, in view of the medical evidence and the VE's testimony on the point, the failure to make a finding one way or the other undermines the ALJ's ultimate conclusion.

The Commissioner argues that plaintiff waived this point by failing to pose any questions to the VE "based on the need to use a cane." Doc. 33, p. 17. It is entirely unclear what additional questions should have been posed. The VE is a vocational expert, not a medical expert, and could not have opined about whether Mr. Allen needs to use a cane while standing. In any event, this argument ignores the fact that it is the Commissioner, not the plaintiff, who bears the burden at step five of establishing that Mr. Allen can do other work. **Zurawski v. Halter, 245 F.3d 881, 886 (7th Cir. 2001)**.

The Commissioner also points out that the ALJ gave plaintiff a sit/stand option. In the Court's view, this fact supports plaintiff's position rather than the

18

Commissioner's. The ALJ accepted that Mr. Allen needs to be able to sit or stand at will. However, according to the VE, if he needs a cane while standing, he cannot work if he needs to stand more than 10% of the workday. This would seem to negate the sit/stand option,

## Conclusion

This Court concludes that ALJ failed to build the requisite "logical bridge" from the evidence to her conclusions. **Scott v. Astrue, 647 F.3d 734, 740 (7th Cir. 2011)**. Remand is required where, as here, the decision "lacks evidentiary support or is so poorly articulated as to prevent meaningful review." **Kastner v. Astrue, 697 F.3d 642, 646 (7th Cir. 2010), citing Steele v. Barnhart, 290 F.3d 936, 940 (7th Cir. 2002).**

The Court wishes to stress that this Memorandum and Order should not be construed as an indication that the Court believes that Mr. Allen is disabled or that he should be awarded benefits. On the contrary, the Court has not formed any opinions in that regard, and leaves those issues to be determined by the Commissioner after further proceedings.

The Commissioner's final decision denying Norman Allen's application for social security disability benefits is **REVERSED and REMANDED** to the Commissioner for rehearing and reconsideration of the evidence, pursuant to sentence **four** of 42 U.S.C. §405(g).

The Clerk of Court is directed to enter judgment in favor of plaintiff.

**IT IS SO ORDERED.**

**DATE:   March 12, 2014.**

> **s/ Clifford J. Proud**
> **CLIFFORD J. PROUD**
> **UNITED STATES MAGISTRATE JUDGE**

20